## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Flirts, Inc.; Christopher Sears;　　　　　　　　　　　　　Civil No. 10-633 (DWF/JSM)
Timothy Kresel; and
Ricardo Rodriquez,

　　　　　　Plaintiffs,

v.　　　　　　　　　　　　　　　　　　　　　　　　　　　**MEMORANDUM**
　　　　　　　　　　　　　　　　　　　　　　　　　　　**OPINION AND ORDER**
The City of Harris, Minnesota,
a Municipal Corporation,

　　　　　　Defendant.
_____

Randall D. B. Tigue, Esq., Randall Tigue Law Office, PA, counsel for Plaintiffs.

Mary D. Tietjen, Esq., and James J. Thomson, Esq., Kennedy & Graven, Chartered, counsel for Defendant.
_____

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendant The City of Harris (the "City"). (Doc. No. 23.) For the reasons set forth below, Defendant's motion is denied.

## BACKGROUND

In this suit, Plaintiffs challenge the validity of the City's recently adopted ordinance regarding adult establishments. Flirts, Inc., ("Flirts") is a Minnesota corporation that owns and operates a nightclub known as "Heartbreaker's" in Harris, Minnesota. Heartbreaker's features live semi-nude and nude dance entertainment.

Plaintiffs Sears, Kresel, and Rodriguez are officers and shareholders of Flirts.  They purchased the real estate upon which Heartbreaker's nightclub is located.  Kresel holds the liquor license issued by the City to Heartbreaker's.  Plaintiffs purchased Heartbreaker's in 2003.  For approximately thirteen years prior to Plaintiffs' purchase, the establishment featured live nude and semi-nude dance entertainment.  (Aff. of Orlin Paul Carlson ("Carlson Aff.") ¶¶ 1-3.)[1]

**Heartbreaker's and the City Council 2004-2005**

City Council minutes show that in January 2004, Jerry Asbury, who was a part-owner of Heartbreaker's at the time, appeared before the City Council and discussed extending the hours of Heartbreaker's to allow for a 2:00 a.m. closing time.  (Aff. of Dawn Luke ("Luke Aff.") ¶ 2, Ex. A.)  At that time, Asbury discussed the owners' intention to have a sports bar at the establishment.  (*Id*.)  The City Council approved a 2:00 a.m. bar closing time for a period of two months.  (*Id*.)  In February 2004, the City Council approved a transfer of the liquor license to Kresel, pending a background check, and further approved an extension of the 2:00 a.m. bar closing time effective until July 2004.  (*Id*.)

---

[1] The Court notes that Plaintiffs have incorporated by reference briefs filed with their Motion for Preliminary Injunction and Temporary Restraining Order filed in March 2010.  (*See* Doc. No. 2.)  The Court does not endorse this practice because it has forced the Court to ferret through a brief on a different motion, filed more than a year ago, to attempt to ascertain Plaintiffs' arguments regarding the constitutionality of the Ordinance at issue.  Regardless, the City does not appear to have objected to this method of responding to its motion.  As a result, the Court cites to some affidavits that were filed with that earlier briefing.

At a March 2004 City Council meeting, a resident complained "that 'Heart Breakers' had garbage all around the premises." (*Id*.) In June 2004, the City Council approved an on-sale liquor license for Heartbreaker's. (*Id*.) In August 2004, the City Council approved another six-month extension to the 2:00 a.m. bar closing time. (*Id*.) Then, at the December 2004 City Council meeting, the Council heard from another resident who "had complaints regarding the garbage around 'Heart Breakers' and felt it should be picked up daily." (*Id*.) In response, the mayor told the resident that the establishment would be notified of this concern and would be advised to clean up their trash daily. (*Id*.) The City Council minutes from this meeting reflect that, at that time, there had been no issues with the 2:00 a.m. bar closing time. (*Id*.)

In January 2005, the City Council discussed Heartbreaker's request for a Sunday liquor license. (Luke Aff. ¶ 3, Ex. B.) The City Council approved Heartbreaker's Sunday liquor license, contingent on Heartbreaker's providing evidence of their compliance with the Health Department and the state statute regarding food service. (*Id*.) At the City Council's April 2005 meeting, a resident "commented that the garbage around Heart Breaker's has not improved any." (*Id*.) At the City Council's May 2005 meeting, City Council member Chaffee "informed the Council he had spoke [sic] to Heartbreaker's and informed them the property is still a mess. They assured the city they would clean it up, but according to residents they have not. Chaffee will talk to them again." (*Id*.) The June 2005 City Council minutes reflect that Chaffee informed the Council that they had received "several complaints regarding the trash and drinking in the parking lot at Heartbreaker's." (*Id*.) At a June 27, 2005 City Council meeting, the City

3

Council heard from residents who described an incident that occurred outside of Heartbreaker's involving drinking and fighting. (*Id.*; *see also* Luke Aff. ¶ 4, Ex. C.) The City Council set a public hearing for July 25, 2005, to discuss citizen complaints against Heartbreaker's. (*Id.*) The City Council also approved a restrictive liquor license for Heartbreaker's for one year. (*Id.*) At the July 25, 2005 City Council meeting, the City Attorney informed the Council about a letter of understanding that was prepared to designate a contact person for Heartbreaker's and the City in order to improve communication between the two. (*Id.*) According to the Council minutes, the letter "also addresses cleanliness around the property, including the edge of neighboring yards, law enforcement notification, council meeting participation and operation of the bar." (*Id.*) The City Council met again on September 12, 2005, at which point the Sheriff "informed the Council that he had heard concerns about the area around Heartbreakers" and that the Sheriff's Department would "step up enforcement." (*Id.*) The minutes from that meeting also note that the Sheriff "also noted that the 2:00 a.m. bar closing has been a problem within the entire county because of Heartbreakers." (*Id.*)

**Heartbreaker's and the Mayor**

Rick Smisson was the City's Mayor from 2005 to 2008. (Aff. of Rick Smisson ("Smisson Aff.") ¶ 1.) Smisson stated that "[f]or well over a year" during his time as mayor, it was not uncommon to receive two to three complaints a month regarding Heartbreaker's regarding drunk patrons urinating in neighbors' yards, noise outside the bar, trash, pornographic literature left in yards, condoms left in the street, and occasional fights. (*Id.* ¶ 2.) Smisson stated that these concerns were different from those raised

4

about Big Daddy's, the other bar in the City, because of Heartbreaker's issues with condoms and pornographic literature. (*Id.* ¶ 3.) But Smisson acknowledged that Big Daddy's, too, had problems with noise and garbage. (*Id.* ¶ 3.) Smisson further stated that the City "incurred significant legal costs and the use of staff hours in dealing with Heartbreaker's." (*Id.* ¶ 4.)

**Heartbreaker's and the Police**

The City submits that between January 2003 and June 2010, the Chisago County Sheriff and the North Branch police department received ninety-four calls regarding Heartbreaker's. (Aff. of Toni M. Decker ("Decker Aff.") ¶ 5, Ex. F.)

**Enactment of the Ordinance 2009-2010**

The City Attorney asserts that in late 2009, the City began discussing the adoption of an ordinance related to adult establishments. (Aff. of Peter J. Grundhoefer ("Grundhoefer Aff.") ¶ 9.) He further states that city officials "consulted with outside legal counsel and obtained copies of several studies conducted by other municipalities relating to the adverse effects of adult establishments." (*Id.*) The City's Planning Commission discussed issues related to enactment of the ordinance at a public hearing on January 4, 2010. (Luke Aff. ¶ 5, Ex. G.) The matter was further discussed at a public hearing of the Planning Commission on February 1, 2010. (*Id.* ¶ 6, Ex. I.) Throughout these hearings, numerous Harris residents voiced concerns regarding the impacts of adult businesses in the City and spoke in favor of the ordinance. (*Id.* ¶¶ 6-8, Exs. G, I, K.)

The City Council approved the Ordinance on February 8, 2010. (Luke Aff. ¶ 8, Ex. M (the "Ordinance").)[2] The Ordinance was codified as Chapter 117 of the Harris City Code and became effective on March 4, 2010.

Relative to this action, the Ordinance deems it unlawful to operate an adult establishment without first having secured a license. (Luke Aff. ¶ 8, Ex. M (Harris City Code, Chapter 117).) Among other things, the license application form is required to list the hours of operation, which are limited by the Ordinance to Monday through Saturday, 10:00 a.m. to 12 midnight. (*Id*. Chapter 117.05(A)(7).) The Ordinance also sets forth a license fee of $7,500.00 per year for an adult establishment (Chapter 117.05(B); Aff. of Timothy Kresel ("Kresel Aff.") ¶ 5.) The $7,500 license fee was purportedly based on the estimated costs of responding to calls at Heartbreaker's, including $3,000 for police calls, $4,000 for garbage cleanup, $450 for background checks, $200 of administrative costs, and $270 for first responder calls. (Luke Aff. ¶ 6, Ex. I at 7-8.) Additional conditions for licensure are set forth in the Ordinance as follows:

(1) No owner, operator, or manager of an adult entertainment center shall permit or allow any dancer or other live entertainer to perform nude.
(2) No dancer, live entertainer, patron or any other person may be nude in an adult entertainment center.
(3) No dancer, live entertainer or performer shall be under 18 years old.
(4) All dancing or live entertainment shall occur on a platform intended for that purpose and which is raised at least two feet from the level of the floor.
(5) No dancer or performer shall fondle, touch, or caress any patron and no patron shall fondle, touch, or caress any dancer or performer.

---

[2] The Ordinance was amended in January 2011 to exclude theatrical performances from the scope of the Ordinance and to delete the word "buttocks" from the definition of "nude." (Luke Aff. ¶ 9, Ex. N.)

6

  (6) No patron shall pay or give any gratuity directly to any dancer or performer.
  (7) No dancer or performer shall solicit any pay or gratuity from any patron.

(Chapter 117.05(G).)

   The Complaint was filed here on March 4, 2010.  (Doc. No. 1.)  The Complaint alleges that Chapter 117 of the Harris City Code is unconstitutional--both facially and as applied to Plaintiffs--on the following grounds:  (1) the Ordinance was enacted without adequate evidentiary foundation; (2) the licensing requirements do not provide any additional benefits to the City that were not present as a result of Plaintiffs' establishment being subject to a liquor license; (3) the license is an unreasonable prior restraint on First Amendment rights; (4) the nudity prohibition is unconstitutionally overbroad in violation of the First and Fourteenth Amendments of the United States Constitution; and (5) the Ordinance's behavioral restrictions will suppress or substantially reduce access to constitutionally protected speech.  (Compl. ¶ 32(a-e).)

## DISCUSSION

   Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir.1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Nude dancing is expressive conduct protected by the First Amendment, 'though . . . only marginally so.'" *Jake's, Ltd., Inc. v.. City of Coates*, 284 F.3d 884, 886 (8th Cir.2002) (quoting *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-66 (1991)). An ordinance that does not constitute an outright ban on adult establishments is "properly analyzed as a form of time, place, and manner regulation." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (1986). Time, place, and manner regulations are acceptable if they are "content-neutral" and if they are "designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *Id*. at 47.

In applying the *City of Renton* test, the first task is to determine whether the ordinance is content-neutral. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or

8

messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Thus, even if a time, place, and manner ordinance regulates only businesses selling sexually explicit materials, the ordinance is content-neutral if its purpose is to lessen "undesirable secondary effects attributable to such businesses, such as increased crime, lower property values, or deteriorating residential neighborhoods." *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413, 1416 (8th Cir. 1994). Here, the City purportedly targeted its regulations to reducing negative secondary effects. The Ordinance itself notes impacts including "increased crime rates, lower property values, increased transiency, neighborhood blight, and potential health risks." (City of Harris Code Chapter 117.01.)

To survive First Amendment scrutiny, a content-neutral regulation also must be "designed to serve a substantial governmental interest." *City of Renton*, 475 U.S. at 47. Regulations reasonably designed to curb unwanted secondary effects of sexually oriented businesses serve a substantial governmental interest. *Id*. at 50. In identifying and measuring such secondary effects, a city may rely upon studies or evidence generated by other cities "so long as [that] evidence . . . is reasonably believed to be relevant to the problem that the city addresses." *Id*. at 51-52.

Government bodies may not, however, rely on "shoddy data or reasoning" in enacting an ordinance regulating adult property uses. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002). Under *Alameda Books*,

> [t]he municipality's evidence must fairly support the municipality's rationale for its ordinance. If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not

9

> support its rationale or by furnishing evidence that disputes the
> municipality's factual findings, the municipality meets the standard set
> forth in *Renton*. If plaintiffs succeed in casting doubt on a municipality's
> rationale in either manner, the burden shifts back to the municipality to
> supplement the record with evidence renewing support for a theory that
> justifies its ordinance.

*Id*. at 438-439. Justice Kennedy's concurring opinion in *Alameda Books* cautions that a municipality "must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." *Id*. at 449.

### A. Evidence Supporting the Ordinance

The City contends that the Ordinance is constitutional pursuant to the requirements set forth in *City of Renton*. The City asserts that the Ordinance is a valid, content-neutral regulation that was enacted to combat the negative secondary effects of adult businesses. The City points to the various secondary effects studies, as cited in the Ordinance, as well as residents' testimony regarding concerns about the negative effects of Heartbreaker's (and adult businesses, in general) in their community.

The City contends that this Court's decision in *Pao Xiong d/b/a Huff & Puff Tobacco v. City of Moorhead, Minnesota*, 641 F. Supp. 2d 822 (D. Minn. 2009), supports its position that the evidence it relied on in enacting the Ordinance was sufficient. However, this matter presents a different case than *Pao Xiong*. Here, Heartbreaker's was run as an adult establishment featuring nude and semi-nude live dancing for seventeen years prior to the adoption of the Ordinance. Because the City had actual evidence of the adult establishment's secondary effects on the City, the secondary effect studies from

10

other communities provide less support for the Ordinance. Thus, the Court cannot conclude, as a matter of law, that the City's reliance on outside studies to support an Ordinance restricting a business that had been in place for seventeen years prior to the enactment of the Ordinance passes constitutional muster.

Moreover, the Court cannot find, as a matter of law, that the City's reliance on citizen concerns is sufficient to justify enactment of the Ordinance. Many of the citizens' concerns raised are vague in nature. There is no evidence of record that circumstances changed or that problems had escalated since the business began operating as an adult establishment. Other complaints, such as concerns over condoms and pornographic literature found in the City, are not sufficiently tied to adult establishments, especially to Heartbreaker's, which does not sell such goods. (Aff. of Laura Sears ("Sears Aff.") at ¶ 7.) Moreover, questions of fact exist as to whether the imposition of the license fee provision and other restrictions will actually combat the purportedly adverse secondary effects of adult establishments, especially in light of Plaintiffs' argument that many of those same problems are incurred in the City by a bar that does not provide adult entertainment. (*See* Aff. of Rick Smisson ("Smisson Aff.") at ¶ 3 ("The other bar in the City, Big Daddy's . . . also had problems with noise and garbage. . . .") Based on these considerations, the Court cannot conclude as a matter of law that the City's evidence to support the Ordinance was sufficient. The City's motion is denied in this regard.

**B.     The License Fee**

The City argues that its license fee of $7,500 for adult establishments is reasonable in light of the costs incurred by the City in dealing with Heartbreaker's business.

Because the Court finds that fact issues remain as to whether adult establishments like Heartbreaker's incur additional costs because of the adult nature of their business, as opposed to the fees incurred by the City for a non-adult business serving liquor, summary judgment on this issue is denied.

**C.     Remaining Issues**

The City further argues that the Ordinance's no-touch requirement, restriction on direct tipping, and total nudity ban pass constitutional muster.  The Court recognizes that such restrictions may be deemed constitutional under some circumstances.  But here, because the evidence calls into question the legitimacy of the City's reliance on the purported adverse secondary effects, the City has not established a relation between these restrictions and the secondary effects they seek to avoid.  Thus, the Court finds that the record is inadequate to determine whether these restrictions are constitutional.  The Court denies the City's motion on this issue.

## CONCLUSION

Unlike most cases of this nature, the longstanding nature of Plaintiffs' business creates unique circumstances here.  Although the Court has denied the City's motion, the Court recognizes that such a ruling does not necessarily comport with Plaintiffs' chances of success at trial.  That said, it may be in the parties' interest to meet with the Magistrate Judge to discuss settlement before the parties incur additional costs of litigation.  If the parties are so interested, the parties may contact Katie Haagenson, Calendar Clerk to Magistrate Judge Janie S. Mayeron, at 651-848-1190 to discuss scheduling a settlement conference.

Therefore, **IT IS HEREBY ORDERED** that:

1. The City of Harris's Motion for Summary Judgment (Doc. No. [23]) is

**DENIED.**


Dated:  April 27, 2011                           s/Donovan W. Frank
                                                 DONOVAN W. FRANK
                                                 United States District Judge